UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------X
AVRA SURGICAL ROBOTICS, INC.,

                 Plaintiff,

                                    13 Civ. 3309 (NRB)

       - against -

                                   **MEMORANDUM AND ORDER**

BERND GOMBERT,

                 Defendant.
--------------------------------X
**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**


      Plaintiff AVRA Surgical Robotics, Inc. ("AVRA") brings this diversity action against defendant Bernd Gombert, a German engineer whom plaintiff recruited and employed in Germany from 2012 to 2013. AVRA pleads multiple causes of action against Gombert for alleged wrongful activity occurring during his term of employment, including breach of contract, breach of fiduciary duty, tortious interference with contractual relations, and misappropriation of property and funds. Now pending before the Court is defendant's motion to dismiss the complaint for lack of personal jurisdiction or, in the alternative, for failure to state a claim. For the reasons stated herein, defendant's motion is granted based upon a lack of personal jurisdiction over the defendant.

BACKGROUND[1]

I.   **Factual Allegations**

Defendant Bernd Gombert is a lifelong German citizen who has continuously lived and worked in Germany.  Def. Mem. at 1-2; Gombert Decl. ¶ 15.  Gombert is a decorated engineer who studied mechanical and precision engineering at German universities, later became the head of a mechanics lab at a German robotics institute, and ultimately authored many scientific papers and won multiple engineering awards, including Germany's Federal Cross of Merit.  Gombert Decl. ¶¶ 15-19.  Gombert has never lived, worked, owned property, maintained a bank account, or employed anyone in New York.  Def. Mem. at 2; Gombert Decl. ¶¶ 6-12.

Plaintiff AVRA is a Delaware corporation with its principal place of business in New York.[2]  Pl. Opp. at 2.  During the time period relevant to this action, AVRA sought to develop a

---

[1]   The facts recited here draw upon the Amended Complaint ("Compl."), filed September 19, 2013; Defendants' Memorandum of Law in Support of his Motion to Dismiss, filed October 10, 2013 ("Def. Mem."), the Declaration of Bernd Gombert, filed October 10, 2013 ("Gombert Decl."), and the exhibits annexed thereto; Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss, filed November 21, 2013 ("Pl. Opp."); the Declaration of Barry F. Cohen, filed November 21, 2013 as an exhibit to Plaintiff's Opposition ("Cohen Decl."); the Declaration of Stephan Sagolla, filed November 21, 2013 as an exhibit to Plaintiff's Opposition ("Sagolla Decl."); the Declaration of Sonja Falk, filed November 21, 2013 as an exhibit to Plaintiff's Opposition ("Falk Decl."); the Declaration of Susan Stamell, filed November 21, 2013 as an exhibit to Plaintiff's Opposition ("Stamell Decl."); Defendant's Reply Memorandum of Law in Further Support of his Motion to Dismiss, filed December 13, 2013 ("Def. Reply Mem."), and the Reply Declaration of Bernd Gombert, filed December 13, 2013 ("Gombert Reply Decl."), and the exhibits annexed thereto.
[2]   AVRA was formerly known as "RFG Acquisition II Inc." and assumed its present name in August 2012.  Gombert Decl. ¶ 2.

surgical robotics system for use in performing minimally invasive surgery. Def. Mem. at 2-3; Pl. Opp. at 2. In November 2011, AVRA President and Chairman Barry Cohen first approached Gombert at the defendant's offices in Seefeld, Germany. Def. Mem. at 2-3. At the time, Gombert was employed by a German company, RG Mechatronics GmbH ("RGM"), of which he is now the managing director. Gombert Decl. ¶ 32. Cohen, then living temporarily in Seefeld, Germany near AVRA's Munich office while scouting for engineers, recruited Gombert to join AVRA's surgical robotics development team. Def. Mem. at 3.

After months of Germany-based meetings, Gombert, Cohen and AVRA executives decided to form a subsidiary company responsible for the design, marketing, and distribution of the as-yet undeveloped surgical robotics system. Def. Mem. at 3. On July 7, 2012, AVRA, Gombert and another AVRA executive, Stephen Sagolla, also a German citizen, established the subsidiary, MIS-Robotics, GmbH ("MIS"). Def. Mem. at 4. Gombert and Sagolla, as co-managing directors of MIS, each owned 10% of the subsidiary's shares; AVRA held the remaining 80% equity position in MIS. Def. Mem. at 4; Pl. Opp. at 2. MIS was incorporated under German law and maintained its only offices in Seefeld, Germany. Def. Mem at 4; Gombert Decl. ¶ 25.

The following month, AVRA's Board of Directors simultaneously appointed Gombert as AVRA's Chief Scientist and

Technical Officer and Sagolla as AVRA's Chief Executive Officer. Def. Mem. at 4. Although AVRA's board made the appointments in August 2012, Gombert did not execute an employment contract with AVRA until October 5, 2012. Id. Having expressed a willingness to sign an agreement containing the same terms as those in Sagolla's contract, Gombert executed the employment contract in Germany without further negotiation and emailed the signed copy to AVRA. Id.

Among other terms, the employment contract provided for Gombert's 300,000 euro base salary and various benefits, and provided for termination of employment by resignation, discharge by AVRA or death. Gombert Decl. Ex. 2 at ¶¶ 2, 3, 5. The contract also included a confidentiality clause affirming that certain unspecified "confidential information is the exclusive property of AVRA," that Gombert would use that confidential information "solely for the purpose of performing [his] duties on behalf of AVRA," and that he would not use such information "to the detriment of AVRA." Id. ¶ 4. The contract went on to state that if Gombert terminated his employment with AVRA, he would not "own, manage or control any business that competes with AVRA" for a two-year period thereafter. Id. Finally, the contract contained a "Governing Law" clause, providing that "[t]his Agreement will be governed by and construed in accordance with the law of the State of New York without giving

4

effect to the rules of conflicts of law." Id. at ¶ 6. The contract contained no choice of forum clause.

To pursue development of the surgical robotics system, the newly created subsidiary MIS entered into a Development and Manufacturing Agreement in October 2012 with RGM, Gombert's German engineering company, whereby RGM agreed to conduct the engineering work necessary to developing and manufacturing the surgical robotics system and bill MIS accordingly. Def. Mem. at 4-5; Pl. Opp. at 2. Pursuant to this agreement, Gombert assigned RGM engineers to the project and directly supervised their work. Def. Mem. at 5.

AVRA agreed to provide capital for the project to its subsidiary MIS, which would, in turn, pay the invoices issued by RGM for the engineering work. Def. Mem. at 5; Pl. Opp. at 2. To that end, beginning in September 2012, AVRA sold shares in its own corporate entity to American investors, including New York-based investors, and wired that money to Germany. Pl. Opp. at 3. According to Gombert, AVRA's expected financing was supposed to amount to at least 20 million euros in the form of shareholder loans. Def. Mem. at 5; Gombert Decl. ¶ 37. Over the course of the next six months, AVRA provided to MIS loans totaling over 3 million euros, or approximately 4.5 million US dollars. Def. Mem. at 5; Pl. Opp. at 3.

In late 2012, this funding arrangement faltered and the relationship soured. As of December 2012 or before, Gombert began articulating serious concerns about AVRA's failure to fund MIS as promised. Def. Mem. at 5-6. Gombert advised AVRA executives Cohen and General Counsel Jared Stamell of meaningful shortfalls in funding in a December 18, 2012 email entitled "Red Flag – RG Mechatronics is running out of money." Gombert Reply Decl. Ex. 3. In that email, Gombert reiterated financial difficulties he had raised "already several times," and further noted that "[t]his month we can't pay any more the checks for the engineers." Id. Gombert also flagged "unpaid invoices of about USD 900,000 (AVRA) and open invoices of our supplier of about USD 250,000 (RGM)," amounting to "a lack of cash of about USD 1,150,000." Id. Gombert summarized thus: "[In] other word[s]: we need immediately USD 1,500,000 otherwise the party is over." Id.

Over the course of the next few weeks, Gombert's concerns regarding the company's financial health intensified. By email of January 8, 2013, with subject line "Unacceptable situation with AVRA," Gombert raised with AVRA executive Cohen a number of "significant misgivings," including primarily that "AVRA Surgical Robotics, Inc., in the persons of yourself and Jared [Stamell], has made financial commitments to MIS/RGM but not adhered to them." Id. Describing a pattern of insufficient

financing and repeated failures to make good on Cohen's personal "commitment to guarantee the funding," Gombert informed AVRA personnel that "I have had personally to finance salaries, development costs and the complete operational expenses . . . [which] led in December not only to overextension of RGM but also almost to my own personal bankruptcy." Id. Gombert concluded by advising that, if AVRA could not secure the promised operational funding by February 15, "I will be forced to resign from my duties as CTO of AVRA and MIS, and also to terminate the development contract between RGM and AVRA/MIS."[3] Id.

At the same time, AVRA began to fall behind in its payments of Gombert's salary, guaranteed by his employment contract. The parties do not dispute that AVRA satisfied only the first payroll installment owed to Gombert, amounting to only 26,225 euros. Gombert Decl. ¶ 31; Cohen Decl. ¶ 21. This non-payment prompted Gombert to email AVRA executives in January 2013 and complain that "the salary for my contractually-agreed full-time employment for AVRA/MIS has also not yet been paid," a failure that Gombert viewed as symptomatic of AVRA's overall inability

---

[3]     Although the contemporaneous documents, as described here, indicate that AVRA's ability to finance MIS as promised had become seriously compromised, plaintiff disputes the facts suggested by the email record. According to AVRA, Gombert's emails did not reflect the company's financial reality at that time.  Rather, AVRA claims that all invoices issued by MIS were timely paid, with the exception of a period in March 2013 during which Gombert allegedly refused to disclose basic information on the invoiced expenditures.  Pl. Opp. at 8.

to perform as promised.[4]   Gombert Reply Decl. Ex. 3; <u>see also</u> Gombert Decl. ¶ 31.

Against the backdrop of this breakdown in the parties' business relationship, Gombert and partner Sagolla, then AVRA's CEO, began pursuing alternative business opportunities.   On December 7, 2012, Gombert and Sagolla incorporated a German company, Robosmart GmbH, with an eye toward competing in the surgical robotics industry.   Pl. Opp. at 3; Cohen Decl. ¶¶ 8-9. In a December 27, 2012 email to Sagolla, Gombert discussed these steps at greater length, noting that Robosmart and "Plan B" was a direct response to AVRA's failure to provide the necessary development capital.   Pl. Opp. at 3-4 (email translated from the original German); Sagolla Decl. ¶ 8.

Shortly thereafter, in an effort to address the serious funding shortages, Gombert made his first and only trip to New York in late January 2013.   Def. Mem. at 6; Pl. Opp. at 6-7. Gombert spent three days – January 26, 2013 and January 29

---

[4]     Contrary to the documentary record, AVRA replies that Gombert himself instructed AVRA executive Cohen to let his salary accrue unpaid while he decided whether he preferred compensation in AVRA shares or cash.   Cohen Decl. ¶ 21.   This contention is undermined both by Gombert's January 2013 email complaint and by further email evidence suggesting that a dearth of funding contributed to the non-payment.   For example, on February 9, 2013, AVRA employee Susan Stamell emailed Gombert to explain that "AVRA is accruing your invoices, but has not paid your salary because my instructions from Barry and Jared are to pay RGM's bills first, then bills for audit, SEC legal, and so forth, and to defer amounts owed to you for the time being." Stamell Email to Gombert, Feb. 9, 2013, Gombert Reply Decl. Ex. 5.   This email tends to suggest that AVRA was facing more claims on its funds than it could simultaneously satisfy.   In any event, we need not formally endorse either party's version of the details in order to decide the motion before us.

through January 30, 2013 – in New York, making other trips to Dallas and San Antonio in the interim.  Id.  While in New York, Gombert attended a meeting with Cohen, Stamell and AVRA President Sudhir Srivastava, at which AVRA's funding commitments and the project's financial survival were discussed.  Def. Mem. at 6.  At that meeting, Gombert was appointed AVRA's Executive Vice President.  Id.  Also while in New York, Gombert dined with AVRA executives and an AVRA investor and participated in presentations to investment bankers wherein Gombert reported on technical developments.  Id.; Pl. Opp. at 6-7.  According to plaintiff, AVRA raised approximately $500,000 from New York investors as a result of the January 2013 fundraising effort.  Pl. Opp. at 7.  This trip represented the only time Gombert was present in New York during the relevant time period.  Gombert Decl. ¶ 45.

Further meetings followed in February 2013, wherein Gombert, Cohen, Stamell and company accountants convened in Seefeld, Germany to discuss AVRA's continued failure to fund MIS and pay Gombert's salary.  Def. Mem. at 7.  Those meetings failed to result in a productive solution to the capital shortages, which eventually included 1 million euros in unpaid invoices from RGM alone.  Id.  Consequently, and in accordance with the notice he provided earlier in the year, Gombert terminated his position with AVRA on March 1, 2013.  Id.  As

managing director of MIS, Gombert then filed an insolvency petition in Germany on April 12, 2013.  Compl. ¶¶ 43-46.

## II.  Procedural History

On March 20, 2013, AVRA brought its initial complaint in New York State Supreme Court alleging only two causes of action, breach of contract and breach of fiduciary duty, which was served upon defendant Gombert in Germany on April 14, 2013. Def. Mem. at 7.  On May 16, 2013, defendant removed the case to federal court and, on June 6, 2013 filed an initial motion to dismiss.  With the Court's leave, plaintiff filed an amended complaint on September 19, 2013, and defendant withdrew his initial motion to dismiss.  The amended complaint set forth an expanded set of five causes of action: (1) breach of Gombert's employment contract with AVRA, (2) breach of Gombert's fiduciary duty to AVRA, (3) tortious interference with contractual relations as to the investment contract between AVRA and MIS, (4) misappropriation of property, funds and business opportunities, and (5) a request for an injunction enforcing and transferring title to plaintiff in the assets defendant allegedly obtained as a result of misconduct.[5]  Compl. ¶¶ 48-65. Specifically, AVRA contends that during the term of his employment Gombert was pursuing in secret a scheme, allegedly dubbed "Plan B," to compel AVRA to forfeit ownership of MIS's

---

[5]    At oral argument, plaintiff advised that it would not pursue its fifth cause of action for injunctive relief.  Tr. at 2.

product development to him and his newly incorporated German company Robosmart.  Compl. ¶¶ 23-47; see also Pl. Opp. at 3.

Defendant moved to dismiss the amended complaint on October 10, 2013, plaintiff filed an opposition brief on November 21, 2013, and defendant replied on December 13, 2013.  Oral argument was held on July 23, 2014.

At oral argument, the parties advised the Court of three legal proceedings currently underway in Germany.  The first, mentioned in the complaint, is the MIS insolvency proceeding initiated by Gombert pursuant to his obligations under German law as MIS's managing director.  Tr. at 4-5; Compl. ¶¶ 44-46. In connection with that proceeding, the German court appointed an expert who confirmed, after due investigation, that MIS was indeed insolvent.  Tr. at 5.  Thereafter the German court appointed an administrator with authority similar to that of U.S. bankruptcy trustees to seek out company assets on behalf of creditors.  Id.  Defense counsel represented to the Court, with no objection from plaintiff, that the German bankruptcy administrator is also empowered to pursue action against Gombert to the extent it is determined that he misappropriated any of the company's funds.  Tr. at 6.

The remaining two German legal actions were initiated by Gombert against MIS after AVRA, an 80% shareholder of MIS, acted to remove Gombert as MIS's managing director.  Tr. at 4.  In one

of Gombert's actions against MIS, AVRA intervened on MIS's behalf in German court.   Tr. at 4-5.   All three proceedings remain ongoing in Germany.

## DISCUSSION

### III. Legal Standards

On a motion to dismiss for lack of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2), the plaintiff bears the burden of showing that jurisdiction exists over the defendant. See Distefano v. Carozzi North America, Inc., 286 F.3d 81, 84 (2d Cir. 2001) (citing Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez, 171 F.3d 779, 784 (2d Cir. 1999)).   Prior to discovery, plaintiff must only make a prima facie showing of jurisdiction to defeat a motion to dismiss.   See Bank Brussels Lambert, 171 F.3d at 784 (citing Marine Midland Bank, N.A. v. Miller, 664 F.2d 899, 904 (2d Cir. 1981)).

"Because [a] Rule 12(b)(2) motion is inherently a matter requiring the resolution of factual issues outside of the pleadings . . . all pertinent documentation submitted by the parties may be considered in deciding the motion." Woods v. Pettine, No. 13 Civ. 290 (PGG), 2014 WL 292363, at *1 (S.D.N.Y. Jan. 27, 2014) (quoting CMNY Capital L.P. v. Perry, No. 97 Civ. 6172 (MBM), 1998 WL 132846, at *1 (S.D.N.Y. Mar. 23, 1998)) (quotation marks omitted).   At this stage, the court must assume the truth of all allegations in the complaint and must resolve

12

all doubts in plaintiff's favor "notwithstanding a controverting presentation by the moving party." A.I. Trade Finance, Inc. v. Petra Bank, 989 F.2d 76, 79-80 (2d Cir. 1993) (citing Hoffritz for Cutlery, Inc. v. Amajac, Ltd., 763 F.2d 55, 57 (2d Cir. 1985)).

In the alternative, defendant moves to dismiss for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6).   To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007).   A court deciding such a motion must accept as true all factual allegations in the complaint and draw all reasonable inferences in favor of the non-moving party. Anderson News, L.L.C. v. Am. Media, Inc., 680 F.3d 162, 185 (2d Cir. 2012) (citations omitted).   However, plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555.   Where a plaintiff has not "nudged [his] claims across the line from conceivable to plausible," dismissal is appropriate. Id. at 570.

## IV.  Personal Jurisdiction

Defendant's principal challenge to the complaint – and our primary inquiry here – concerns this Court's personal

jurisdiction over defendant, a German citizen and non-resident of New York. "In deciding a question of personal jurisdiction, district courts must conduct a two-part analysis, looking first to the state's long-arm statute and then analyzing whether jurisdiction comports with federal due process." Mario Valente Collezioni, Ltd. v. Confezioni Semeraro Paolo, S.R.L., 264 F.3d 32, 37 (2d Cir. 2001). We begin, then, with an evaluation of the applicable New York statute.

Under New York law, a court may exercise personal jurisdiction over a non-resident defendant based on either general or specific jurisdiction. Overseas Ventures, LLC v. ROW Mgmt., Ltd., No. 12 Civ. 1033 (PAE), 2012 WL 5363782, at *8 (S.D.N.Y. Oct. 26, 2012) (citing Realuyo v. Abrille, 93 F. App'x 297, 298-99 (2d Cir. 2004); Delagi v. Volkswagenwerk AG, 29 N.Y.2d 426, 430 (1972)); N.Y. C.P.L.R. 301-302. Because plaintiff cannot and does not seek to establish general jurisdiction over defendant, the relevant inquiry is whether specific jurisdiction exists under New York's long-arm statute, codified at section 302 of the state's Civil Practice Law and Rules ("CPLR"). See Pl. Opp. at 10 n.2. Specifically, section 302(a) provides:

> As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any non-domiciliary, or his executor or administrator, who in person or through an agent:

1. transacts any business within the state or contracts anywhere to supply goods or services in the state; or

2. commits a tortious act within the state, except as to a cause of action for defamation of character arising from the act; or

3. commits a tortious act without the state causing injury to person or property within the state, except as to a cause of action for defamation of character arising from the act, if he

(i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or

(ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce; or

4. owns, uses or possesses any real property situated within the state.

N.Y. C.P.L.R. 302(a). Plaintiff here claims jurisdiction over defendant on three separate grounds: the alleged transaction of business pursuant to CPLR § 302(a)(1); the alleged commission of a tortious act within the state pursuant to CPLR § 302(a)(2); and the alleged commission of a tortious act outside the state causing injury within the state pursuant to CPLR § 302(a)(3).

Considering each subsection in turn, this Court finds that plaintiff has not demonstrated that specific personal jurisdiction exists under any of the grounds set forth in § 302. Accordingly, defendant's motion to dismiss must be granted.

### A.   C.P.L.R. § 302(a)(1): Claim Arising From Transaction of Business

We begin, as does plaintiff, with § 302(a)(1), whereby long-arm personal jurisdiction exists if (1) a non-domiciliary "transacts any business within the state" and (2) plaintiff's claim arises out of that transaction of business.

For the purposes of this motion, we can assume for the sake of argument that a sufficient transaction of business has been pled.  Even if so, however, AVRA cannot establish specific jurisdiction under § 302(a)(1) because it fails to show that any of its claims against Gombert arise from a transaction of business in New York.  In order to fulfill this required second element of § 302(a)(1) jurisdiction, plaintiff must show "the existence of some articulable nexus between the business transacted and the cause of action sued upon," which amounts to "a substantial relationship to the transaction out of which the instant cause of action arose."  McGowan v. Smith, 52 N.Y.2d 268, 272 (1981).  A "merely coincidental" connection is "too attenuated" to form the necessary nexus in this fact-specific inquiry.  Johnson v. Ward, 4 N.Y.3d 516, 520 (2005).

Here, no such "substantial relationship" has been established.  This jurisdictional shortcoming is evident from the particular causes of action pled: (1) breach of Gombert's employment contract with AVRA, (2) breach of Gombert's fiduciary

duty to AVRA, (3) tortious interference with contractual
relations as to the investment contract between AVRA and MIS,
and (4) misappropriation of property and funds.[6]  Even if their
truth is assumed, the allegations do not suggest that any
wrongful activity arose out of Gombert's alleged transaction of
business in New York.  Rather, all the relevant alleged conduct
occurred thousands of miles away in Germany.  Moreover, the
contracts and duties allegedly breached were formed and executed
in Germany.  To the extent that Gombert did transact business in
New York by attending AVRA's board meeting and conferring with
investors, the complaint does not establish how, if at all,
these activities relate – much less substantially relate – to
the causes of actions pled.  In fact, plaintiff's opposition
brief does not even attempt to argue the requisite nexus for the
first three causes of action.  Plaintiff instead merely contends
that AVRA's fourth claim for misappropriation is substantially
related to Gombert's New York-based activities, seemingly
conceding that no such relationship exists for plaintiff's
breach of contract, breach of fiduciary duty or tortious
interference claims.  Pl. Opp. at 12.

        Perhaps perceiving this weakness in its complaint and
briefing, plaintiff pursued a new and different approach at oral

---

[6]     As noted _supra_, plaintiff dropped its fifth claim for injunctive relief
at oral argument.  Tr. at 2.

argument.   Plaintiff now argues that, even if the various alleged breaches and misappropriations took place in Germany, Gombert made additional fraudulent misrepresentations to AVRA and to investors while in New York in January 2013, which formed the jurisdictional hook necessary under § 302(a)(1).   Tr. at 18 ("[H]e made misrepresentations to AVRA and to people who invested in New York . . . and the loss of the funds was that they were invested under the false thinking that they were going to AVRA's product."); Tr. at 26 ("[H]e came to New York in January and he misrepresented to people that he was developing a surgical robotics system for AVRA Surgical Robotics when it wasn't true.").   See related discussion infra note 8.

Plaintiff's late-breaking allegations of fraudulent misrepresentation do not shield this complaint against defendant's motion to dismiss.   First, no claim for misrepresentation is present in the complaint itself, which plaintiff was already granted leave to amend despite a then-outstanding motion to dismiss.[7]   Moreover, plaintiff undermines its own attempt to shift focus to Gombert's alleged misrepresentation when it states in opposition papers that "Rule

---

[7]     Plaintiff now seeks to exploit the Court's leniency by requesting the opportunity to fix any defects or deficiencies in the complaint that the Court perceives.  Pl. Opp. at 25 n.4.  Having already granted leave to amend once at a meaningful cost of time and resources expended in re-briefing this motion to dismiss, this Court will not authorize plaintiff to consume further judicial and litigant resources in yet another round of amendments and briefing.

8(a)(2) of the Federal Rules of Civil Procedure governs AVRA's claims," thereby disclaiming the application of the heightened standards of Rule 9. Pl. Opp. at 15. But because any claim for misrepresentation – either fraudulent or negligent – must meet Rule 9's heightened pleading standards, AVRA thus concedes what is evident from the face of its complaint – that this case involves no misrepresentation claim. See Aetna Cas. and Sur. Co. v. Aniero Concrete Co., Inc., 404 F.3d 566, 583-84 (2d Cir. 2005) (applying Rule 9 pleading standards to claims involving negligent misrepresentation and fraud).

Having failed to establish that its claims against Gombert arise out of alleged in-state transactions of business, plaintiff cannot establish jurisdiction under CPLR § 302(a)(1).

## B. C.P.L.R. § 302(a)(2): Claim Arising from Commission of Tortious Act Within the State

Plaintiff also fails to show the existence of personal jurisdiction under CPLR § 302(a)(2), which extends specific jurisdiction to claims arising from the commission of a tortious act within the state. As an initial matter, New York law limits § 302(a)(2) jurisdiction to tort claims, so plaintiff cannot rely on this provision to authorize specific jurisdiction for its contract claim. Pramer S.C.A. v. Abaplus Int'l Corp., 76 A.D.3d 89, 97 (N.Y. App. Div. 1st Dept. 2010) (citing Fantis Foods v. Standard Importing Co., 49 N.Y.2d 317, 324 (1980)). As

to its tort claims, plaintiff's resort to § 302(a)(2) is similarly futile.  The New York Court of Appeals has construed this provision to require that the defendant was physically present in New York when he committed the tort.  <u>See</u> <u>Bensusan</u> <u>Restaurant Corp. v. King</u>, 126 F.3d 25, 28 (2d Cir. 1997) (citing <u>Feathers v. McLucas</u>, 15 N.Y.2d 443, 458 (1965)).  As discussed <u>supra</u>, however, the torts alleged in the complaint admittedly occurred far from New York, in Germany.[8]  Accordingly, no jurisdiction lies under CPLR § 302(a)(2).

**C.   C.P.L.R. § 302(a)(3): Claim Arising From Commission of Tortious Act Outside the State, Causing Injury Within the State**

Plaintiff's final argument for jurisdiction under CPLR § 302(a)(3) is similarly unavailing.  Section 302(a)(3) extends jurisdiction to actions arising out of the commission of a tortious act outside New York, causing injury within the state, if the defendant either (1) "regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state," or (2) "expects or should reasonably expect the act to have consequences in the state and

---

[8]   Once again, at oral argument plaintiff attempted to resort to a fraudulent misrepresentation theory to ameliorate this deficiency.  Tr. at 18 ("[H]e made misrepresentations to AVRA and to people who invested in New York, that's [§ 302](a)(2).").  For the reasons already discussed, because the complaint itself does not plead a misrepresentation claim, the allegations of misrepresentation raised at oral argument are irrelevant.  We also note that the complaint makes no claim on behalf of AVRA's investors, presumably due to a lack of standing.

derives substantial revenue from interstate or international commerce."

With regard to the first clause of § 302(a)(3), a cursory glance at the facts here makes clear that Gombert's single, anomalous three-day trip to New York does not constitute "regularly do[ing] or solicit[ing] business" in New York or, indeed, any persistent course of conduct in New York, as is required under the first clause. Nor did Gombert derive substantial – or, in fact, any – revenue from goods used or consumed or services rendered in New York, since AVRA and MIS never even approached the point where a surgical robotics product was ready for marketing or sale in New York. Tr. at 2-3.

Plaintiff is equally unable to establish the required elements of the second clause of § 302(a)(3), whereby specific jurisdiction may exist if a defendant who derives substantial revenue from interstate or international commerce commits a tort outside New York, causing injury in New York, where he should reasonably expect the act to have consequences. Section 302(a)(3), like § 302(a)(2), is expressly limited to tortious conduct, and thus cannot confer jurisdiction over plaintiff's breach of contract claim. See Warck-Meister v. Diana Lowenstein Fine Arts, 775 N.Y.S.2d 859, 860 (N.Y. App. Div. 1st Dept. 2004). As to plaintiff's remaining three claims for breach of

fiduciary duty, tortious interference with contractual relations, and misappropriation, plaintiff has sufficiently shown neither the requisite injury sited in New York nor defendant's receipt of substantial revenue from interstate or international commerce.

As defendant argues, "the suffering of economic damages in New York is insufficient, alone, to establish a direct injury in New York for N.Y. C.P.L.R. § 302(a)(3)." Troma Entertainment, Inc. v. Centennial Pictures Inc., No. 12 Civ. 1883, 2013 WL 4766854 (2d Cir. Sept. 6, 2013) (quoting Penguin Group (USA) Inc. v. Am. Buddha, 609 F.3d 30, 38 (2d Cir. 2010)); see also Def. Mem. at 16. The New York Court of Appeals instructs that § 302(a)(3) "requires as a predicate for personal jurisdiction 'a closer expectation of consequences within the State' than the indirect loss of profits." Hargrave v. Oki Nursery, Inc., 636 F.2d 897, 900 (2d Cir. 1980) (quoting Fantis Foods Inc. v. Standard Importing Co., 49 N.Y.S.2d 317, 326 (1980)). Accordingly, without more, there is no sufficient showing of in-state economic injury where, as here, "a defendant commits a business tort such as unfair competition or diversion of opportunities in one state and the ultimate result is a loss of profits to the plaintiff which is fortuitously domiciled in another state." Id. (citations omitted). Rather, especially for claims involving "a nonphysical, commercial injury," the

situs of injury "is where the critical events associated with the dispute took place." Weiss v. Greenburg, Traurig, Askew, Hoffman, Lipoff, Quentel & Wolff, P.A., 446 N.Y.S.2d 447, 449 (3d Dep't 1981) (internal quotation marks and citations omitted). See also Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez, 171 F.3d 779, 784 (2d Cir. 1999) ("The situs of the injury is the location of the original event which caused the injury, not the location where the resultant damages are subsequently felt by the plaintiff.") (quoting Hermann v. Sharon Hosp., Inc., 522 N.Y.S.2d 581, 583 (2d Dep't 1987).

Pursuant to this precedent, the situs of injury – i.e., the location of the events causing the injury, rather than the location where resultant damages were felt – belongs in Germany rather than New York.  To the extent that Gombert breached his fiduciary duty to AVRA by incorporating under German law the competing company Robosmart, or interfered via his Germany-based conduct with a valid investment contract between AVRA and the German corporate entity MIS, or misappropriated monies that AVRA had previously wired to MIS's German bank accounts, those injuries were firmly sited in Germany, where AVRA also maintained corporate offices.  Plaintiff makes little attempt here to establish otherwise.  See Pl. Opp. at 13.  That AVRA's principal place of business is New York is merely a matter of

"fortuitous[] domicile[]" rather than situs of injury. Hargrave, 636 F.2d at 900.

Finally, and in addition to these deficiencies, plaintiff is unable to establish that defendant Gombert "derives substantial revenue from interstate or international commerce," which is also required for jurisdiction under CPLR § 302(a)(3). The undisputed facts here instead indicate that Gombert received compensation of only 26,225 euros, a fraction of his promised 300,000 euro salary, which partially motivated his complaints to AVRA and the breakdown of the parties' relationship. See supra Section I. Further, as a legal matter, the substantial interstate commercial revenue requirement is intended to "narrow[] the long-arm reach to preclude the exercise of jurisdiction over nondomiciliaries who might cause direct, foreseeable injury within the State but whose business operations are of a local character." Ingraham v. Carroll, 90 N.Y.2d 592, 599 (1997) (citation omitted). The New York Court of Appeals regards this provision as a "bigness requirement designed to assure that the defendant is economically big enough to defend suit in New York." Id. The defendant in the instant action is no large corporate entity, but rather an individual engineer. The entirety of his roughly 18-month business relationship with plaintiff occurred in Germany, with the sole exception of a three-day trip to New York. He personally

24

received only 26,225 euros in remuneration from abroad. Given the comparatively little revenue this individual defendant derived from interstate commerce, CPLR § 302(a)(3) does not extend personal jurisdiction over him.

Plaintiff has failed to meet its burden of establishing jurisdiction under any of the enumerated provisions of New York's long-arm statute. Accordingly, it is unnecessary to engage in the federal due process inquiry, whereby courts consider "minimum contacts," "traditional notions of fair play and substantial justice" International Shoe Co. v. State of Washington, 326 U.S. 310, 316 (1945), and a defendant's "purposeful[] avail[ment] of the privilege of conducting activities within the forum State." World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980). We thus merely observe, without deciding, that defendant has put forth compelling arguments that to extend personal jurisdiction over him would run afoul of constitutional due process norms. Parenthetically, we further note that, given the many close contacts with Germany and the ongoing legal proceedings in that country, this action would seem to be much better suited to litigation and resolution in a German forum. As to the case sub judice, defendant's motion to dismiss for lack of personal jurisdiction is granted.

## V.    Failure to State a Claim

Having found a lack of personal jurisdiction, this Court will not consider whether plaintiff's allegations are sufficient to state a claim.    Accordingly, we do not reach defendant's second proffered ground for dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6).

### CONCLUSION

For the foregoing reasons, defendants' motion to dismiss is granted insofar as this Court has no personal jurisdiction over defendant Gombert for the purposes of this action.    This Memorandum and Order resolves Docket No. 18, and the Clerk of Court is respectfully requested to close this case.

Dated:    New York, New York
          August 21, 2014

NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE

Copies of the foregoing Memorandum and Order have been mailed on this date to the following:

**Attorneys for Plaintiffs**

Jared B. Stamell, Esq.
Andrew R. Goldenberg, Esq.
Stamell & Schager, LLP
One Liberty Plaza, 23rd Floor
New York, NY 10006

**Attorneys for Defendants**

Caroline J. Heller, Esq.
Leah Edmunds, Esq.
Greenberg Traurig, LLP
MetLife Building
200 Park Avenue
New York, NY 10166